Kylleen **HARGRAVE–THOMAS**,
Petitioner,

v.

Joan **YUKINS**, Respondent.

Civil Case No. 00–040171.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 21, 2002.

**754**

Bridget M. McCormack, Michigan Clinical Law Program, Ann Arbor, Andrea D. Lyon, DePaul College of Law, Chicago, IL, for petitioner.

Joseph A. Puleo, Wayne County Prosecutor's Office, Detroit, William C. Campbell, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, for respondent.

### OPINION AND ORDER

GADOLA, District Judge.

Before the Court is Petitioner's motion for the writ of habeas corpus [docket entry 1]. This Court has entertained the parties' written submissions and oral arguments, and has held an evidentiary hearing. For the reasons set forth below, this Court shall grant the writ, vacate Petitioner's conviction and sentence, and order that the State of Michigan either grant Petitioner a new trial within ninety days of entry of this order or release Petitioner unconditionally.

## I FACTUAL AND PROCEDURAL BACKGROUND

On November 5, 1993, the Honorable Wendy Baxter of the Recorder's Court for the City of Detroit found Petitioner guilty of first degree murder (M.C.L.750.316) and burning a dwelling house (M.C.L.750.72), after a bench trial. On May 2, 2000, Petitioner filed a motion for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 and a brief supporting that motion. After extensive discovery, Petitioner has augmented her initial brief with a supplemental brief. Respondent has filed an answer and a brief in response to Petitioner's motion.

At trial, Wayne County Assistant Prosecuting Attorney Michael Reynolds represented the State of Michigan. The prosecution's theory was that Petitioner had murdered the victim, her boyfriend Manuel Joseph Bernal, out of romantic jealousy and then set his house on fire. (TT[1] I at 12:2–6.)

---

1. "TT" refers to the transcript of the trial proceedings before the Honorable Wendy M. Baxter in June,. 1993. There are seven volumes of this transcript, which the Court refers to by Roman numeral.

Lead defense-counsel was Rene Cooper, and his co-counsel was Nicholas Venditelli. Neither received any compensation for their services. The defense did not present a theory of the case, made no opening argument, and put forth no evidence. During his closing argument, Attorney Cooper emphasized simply that the prosecution's proofs amounted to nothing but innuendo and speculation and thus formed an insufficient basis upon which to find Petitioner guilty. (TT V at 3.)

The evidence before the trial court fills six volumes of trial transcripts. The following is the key evidence that the prosecution adduced as to Petitioner's guilt.

On October 11, 1991, rescue personnel responded to a report of a fire at the home of Mr. Bernal. Lt. Martin Reddy, a fireman and emergency medical technician, testified as follows. He arrived at Mr. Bernal's house at approximately 7:15 a.m. (TT I at 33–34.) Firemen observed smoke coming from Mr. Bernal's house and kicked in Mr. Bernal's locked front-door. (TT I at 34–35.) After working their way through the house, firemen encountered Mr. Bernal's corpse, which was on his bed. (TT I at 39–40.)

Dr. Bader Casin, Chief Medical Examiner for Wayne County, testified that: Mr. Bernal died of a stab wound to the chest (TT I at 113); the fire in Mr. Bernal's home had begun after Mr. Bernal's death (TT I at 121); Mr. Bernal's stomach contents had not been emptied before he died, which suggested that Mr. Bernal had eaten within three hours of his death (TT I at 124); Mr. Bernal had scratch marks near the knife wound that were consistent with, but were not necessarily, fingernail scratches (TT I at 116); 15 to 20% of Mr. Bernal's corpse burned in the fire (TT I at 120); and Mr. Bernal had no traces of alcohol or illegal drugs in his bloodstream when he died (TT I at 122–23).

The prosecution's theory as to motive was that Petitioner was a woman scorned: that before his murder, Mr. Bernal had spurned Petitioner's hopes that he would marry her, and Petitioner then killed him in a rage. Sgt. Russell Nowaczck was the officer in charge of investigating Mr. Bernal's death. According to Sgt. Nowaczck's testimony, early in the investigation of Mr. Bernal's murder, Petitioner had told him that she and Mr. Bernal "were going to get married" (TT III at 104:11–13) and that they had set a wedding date of "January 5th" (TT III at 110:1–2). Later in the investigation, however, Sgt. Nowaczck told Petitioner that his detective work had uncovered evidence that Mr. Bernal "was still kind of playing the field asking other girls out." (TT IV at 73:14–19.) Sgt. Nowaczck testified that, when he asked Petitioner "now, [Mr. Bernal] didn't even want to get married, did he"?, Petitioner "didn't have a response but she was nodding her head in the affirmative manner." (TT IV at 73:22–25.)

The testimony of Helen Bernal, Mr. Bernal's mother, dovetailed with Sgt. Nowaczck's version of events. She testified that, on October 10, 1991, she had expressed to her son her "[p]retty strong" opposition to Mr. Bernal's relationship with Petitioner (TT I at 26:4), and that she had provided financial assistance to her son totaling more than $24,000.00 (TT I at 25:16–20). This evidence was consistent with the prosecution's theory that, the day before his murder, Mr. Bernal had a powerful incentive to abort any plans he had to marry Petitioner. On a related note, a friend of Petitioner and Mr. Bernal, Orvetta Brown, testified that, when she had asked Petitioner and Mr. Bernal on October 9, 1991 whether they had plans to marry, both responded with silence. (TT II at 78:3–11.)

Several other aspects of the evidence buttressed the prosecution's theory as to motive. First, there was no evidence to suggest that the murderer had stolen any of Mr. Bernal's property. In fact, Mr. Bernal's wallet (TT III at 117:5–8) and other valuable items of property were undisturbed, and there were no signs of forced entry or struggle. Thus there was no evidence suggesting that robbery would have been the motive for the killing.

Second, Sgt. Nowaczck testified as follows. During an interview that he conducted with Petitioner on April 27, 1992, he told Petitioner that police knew that, shortly before the murder, Mr. Bernal's mother had told Mr. Bernal that Petitioner was not welcome in her home for Thanksgiving dinner. (TT IV at 74:1–12.) Petitioner then agreed with Sgt. Nowaczck's assertion that Mr. Bernal was a "mama's boy." (TT IV at 74:15–19.) Petitioner stated that she "saw where this conversation was going" and left the room, only to return a short while later and ask whether she was under arrest. (TT IV at 74–75.) When Sgt. Nowaczck informed Petitioner that she was free to leave, she departed. (TT IV at 75:1–5.) This evidence was consistent with the prosecution's theory that Petitioner had become convinced that Mr. Bernal would not marry her, and then murdered him out of anger aroused by that belief.

The prosecution's chief evidence as to opportunity was that, as Mr. Bernal's paramour, Petitioner had means of access to his house, including a key and a garage-door opener. (TT VI at 51:21–23.) The prosecution also adduced the testimony of a neighbor of Mr. Bernal's, Marymargaret Brown, to the effect that an auto had almost struck her truck as she was driving to work in the pre-dawn hours of October 11. (TT II at 112:16–18.) According to Ms.[2] Brown's testimony, when the two vehicles were close to one another, she and the driver of the auto looked at each other's faces at a range of roughly three feet. (TT II at 114:5–7.) Ms. Brown also testified that she had gotten a good look at the auto itself, and that these events occurred near Mr. Bernal's house.

Ms. Brown further testified as follows. She first spoke with Sgt. Nowaczck at her home on May 1, 1992, which was more than six months after the murder, and described her encounter with the auto on October 11, 1991. (TT II at 121–22.) Sgt. Nowaczck had extensive discussions with Ms. Brown, which included showing her a book of female hair styles. (TT II at 123.) On May 23, 1992, Ms. Brown identified Petitioner from a photographic line-up as the person she had seen on October 11, 1991. (TT II at 129.) Ms. Brown then identified Petitioner in court as the woman whose auto had almost hit her truck on October 11, 1991. (TT II at 134:13–14.) Ms. Brown testified, in fact, that she had "no doubt" that she had identified the right person. (TT II at 135:12–13.) Ms. Brown's testimony was the only piece of evidence placing Petitioner near the arson scene on October 11, 1991, and Judge Baxter later characterized Ms. Brown's testimony as "evasive." (TT V at 75:19–24.)

Another eyewitness, a jogger, testified that he saw a vehicle resembling Petitioner's car in the vicinity of Mr. Bernal's home at around 5:00 a.m. on October 11.

**2.** Women are referred to interchangeably throughout the trial transcripts and the parties' submissions as "Miss," "Mrs.," or "Ms." The Court is thus unaware of which courtesy title any particular woman would prefer. Although the Court is reluctant to abbreviate a word that does not exist, the Court shall defer to society's increasing tendency to use the honorific "Ms." by default. *But cf.* Roy H. Copperud, *A Dictionary of Style and Usage* 240 (1964) (reasoning that "Miss" is the correct title when a woman is named in connection with her career).

Another eyewitness, neighbor Gregory Thompson, testified that Mr. Bernal's garage door was open at around 5:15 a.m. on the day of the murder, that it was closed by 6:20 a.m., and that a light was on inside of the house. (TT II at 24–28.)

During his closing argument, defense counsel conceded that the prosecution had proven that "opportunity is certainly there." (TT V at 42:20–22.)

As to the evidence supporting means, there is no dispute that the murderer committed the crime with a knife removed from Mr. Bernal's kitchen and then set fire to Mr. Bernal's home, apparently to cover up the crime. Buttressing the latter point was Robert Perry, an expert on arson, who testified that the fire was set intentionally, probably with a match or lighter. (TT I at 48, 65.) There was thus evidence that, had Petitioner been in Mr. Bernal's home at the time of the murder, she would have had the means to execute the crimes.

In addition to the evidence as to motive, opportunity, and means, there were several other key pieces of circumstantial evidence pointing to Petitioner's guilt. Respondent points out these pieces of evidence on pages 43 and 44 of her brief filed on November 7, 2000. First, the evidence showed that Petitioner was the last person known to have seen Mr. Bernal alive, having been with Mr. Bernal until approximately midnight before the murder. Second, the evidence showed

that Petitioner admitted to having broken a fingernail the evening before Mr. Bernal's murder.[3]

During oral argument, Respondent also pointed out that there was evidence that Petitioner exhibited guilty knowledge on two occasions. Respondent first pointed to the testimony of Petitioner's co-worker, Carrie Martin. Ms. Martin testified that Mr. Bernal's mother called Petitioner at work on October 11 and, shortly after speaking with Mr. Bernal's mother, Petitioner called the police to ask what had happened because Petitioner "knew something was wrong with [Mr. Bernal]. That's why his mother called." (TT II at 47:24–25.) Ms. Martin testified that she then drove Petitioner to the police station. During the ride, according to Ms. Martin, Petitioner discussed only two options as to how Mr. Bernal had died: murder and suicide.[4] (TT II at 50:3–23.) Respondent also pointed to evidence that, when Sgt. Nowaczck confronted Petitioner with the assertion that her nail marks were found near the stab wound, Petitioner provided several contradictory explanations as to why one of her fingernails was broken.

The prosecution adduced no direct evidence that Petitioner murdered Mr. Bernal. As Judge Baxter aptly noted during the prosecution's closing argument, "[t]his [was] a circumstantial evidence case." (TT V at 57:6–7.)

---

**3.** Although this evidence is consistent with the theory that the scrapes on Mr. Bernal's corpse were nail marks left by Petitioner, Judge Baxter rejected this theory at trial, expressly declining to conclude that the abrasions on Mr. Bernal's corpse were from fingernail scratches. (TT VI at 57:6–7.12)

**4.** At this Court's evidentiary hearing, Petitioner's counsel argued that Petitioner's statements are not surprising, given that the telephone conversations that Petitioner had with Mr. Bernal's mother and police, coupled with

Mr. Bernal's good health the day before, led Petitioner to conclude that Mr. Bernal had died a violent death. Petitioner testified that, when she called police she was told that Mr. Bernal "was dead, but we don't know if it was self-inflicted." (HT I at 164:12–14.) "HT" refers to the transcript of the hearing that this Court conducted. This transcript contains three volumes, each of which is identified by Roman numeral. Volume I is from the hearing of July 24, 2002. Volume II is from the hearing of July 25, 2002. Volume III is from the hearing of July 31, 2002.

Defense counsel failed to call any witnesses or adduce any evidence during Petitioner's trial, limiting their role to conducting cross examinations of the prosecution's witnesses and presenting a closing argument. On November 5, 1993, Judge Baxter issued her findings of fact and conclusions of law from the bench. Judge Baxter found Petitioner guilty of first-degree murder and arson. On November 30, 1993, Judge Baxter sentenced Petitioner to life in prison for murder and a minimum of 36 months', and maximum of 20 years', incarceration for arson.

On March 28, 1994, Petitioner filed motions for a new trial and to disqualify Judge Baxter. Judge Baxter granted the latter motion, and the case was reassigned to Judge Bruce U. Morrow of the Circuit Court. On June 14, 1994, Judge Morrow, relying solely on the parties' written submissions, denied Petitioner's motion for a new trial.

On August 25, 1994, with the aid of new counsel, Petitioner appealed her conviction, arguing that: (1) the evidence was insufficient; (2) the verdict was against the great weight of the evidence; (3) her conviction violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because the trial court decided the case on its own theory, based its decision on facts not adduced at trial, and shifted the burden of proof to the Petitioner; (4) the prosecution denied her a fair trial by deliberately eliciting evidence that she exercised her rights under the Fourth and Sixth Amendments to the U.S. Constitution; (5) the prosecution improperly diluted or shifted the burden of proof; and

(6) she suffered from ineffective assistance of counsel. On March 12, 1996, the Court of Appeals of Michigan rejected each of these arguments in a written opinion. On December 20, 1996, the Supreme Court of Michigan, in a one-sentence disposition, denied Petitioner leave to appeal the Court of Appeals' decision.

Petitioner then filed a motion for relief from judgment under Michigan Court Rule 6.500, on the grounds that (1) she suffered ineffective assistance of counsel and (2) the prosecution had violated the Fifth Amendment by withholding exculpatory evidence. Petitioner unsuccessfully requested an evidentiary hearing as to these issues.

The Circuit Court denied relief on November 23, 1998. Judge Morrow observed that Petitioner had raised neither of these two issues[5] on direct appeal and that MCR 6.508(D)(3) requires a defendant who has not raised an issue on direct appeal to establish "good cause" for that failure before advancing the issue in a later motion. Because, in Judge Morrow's estimation, Petitioner failed to establish the requisite "good cause," he denied Petitioner relief. Judge Morrow also reasoned that Petitioner's arguments failed on their merits.

On July 21, 1999, the Michigan Court of Appeals, in a one-sentence disposition, denied Petitioner's application for leave to appeal Judge Morrow's decision. On April 28, 2000, the Michigan Supreme Court also denied Petitioner's motion in a one-sentence disposition.

Petitioner filed her motion for habeas relief in this Court on May 2, 2000. In paragraph 16 of her motion, Petitioner argues that she is being held unlawfully for

---

**5.** Although Petitioner had argued ineffective assistance both on direct appeal and during her collateral attack, the factual bases for her contention of ineffective assistance differed in each instance. On direct appeal, Petitioner maintained that counsel were ineffective for failing to move to suppress all identification testimony and statements she had made. During her collateral attack, Petitioner alleged that trial counsel were ineffective for failure to investigate.

four reasons, which the Court quotes verbatim from the motion:

I. KYLLEEN HARGRAVE–THOMAS WAS DENIED HER CONSTITUTIONAL RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE STATE FAILED TO DISCLOSE MATERIAL, CENTRAL, AND EXCULPATORY EVIDENCE TO THE DEFENSE.

II. MS. HARGRAVE–THOMAS WAS DENIED HER SIXTH AMENDMENT AND DUE PROCESS RIGHTS TO A FAIR TRIAL BECAUSE OF THE INEFFECTIVE ASSISTANCE OF HER TRIAL COUNSEL.

III. KYLLEEN HARGRAVE–THOMAS' CONVICTION IS UNCONSTITUTIONAL BECAUSE NO RATIONAL TRIER OF FACT COULD FIND PROOF OF GUILT BEYOND A REASONABLE DOUBT, EITHER AT THE TIME OF HER TRIAL, OR CONSIDERING NEW EVIDENCE DISCOVERED FOLLOWING HER TRIAL.

IV. THE PROSECUTION DENIED MS. HARGRAVE–THOMAS THE FULL AND FAIR BENEFIT OF HER CONSTITUTIONAL RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS WHEN IT ELICITED PREJUDICIAL COMMENTS REGARDING MS. HARGRAVE–THOMAS' ASSERTION OF HER CONSTITUTIONAL RIGHTS AND WHEN IT MISSTATED THE LAW, SHIFTED THE BURDEN OF PROOF, AND DILUTED THE BURDEN OF PROOF.

On May 22, 2001, this Court granted Petitioner leave to take discovery. After numerous extensions of the discovery deadline, discovery closed on April 19, 2002. Having received Petitioner's supplemental brief, conducted an evidentiary hearing, and entertained oral argument, this Court is in a position to rule on Petitioner's motion.

## II ANALYSIS

For the reasons set forth below, the Court holds that Petitioner suffered ineffective assistance of trial counsel because of trial counsel's failure to investigate or present evidence or witnesses. Petitioner is entitled to relief on that basis. The Court rejects all of Petitioner's other arguments. The Court would not ordinarily find it necessary to discuss these rejected grounds. If, however, the Sixth Circuit were to reverse this Court's holding that Petitioner is entitled to relief based on her ineffective assistance claim, legal analysis of Petitioner's other contentions would then be necessary. In order to speed proceedings, this Court shall therefore discuss all of Petitioner's arguments. *Cf. West v. Jutras*, 456 F.2d 1222, 1226 (2d Cir.1972) (discussing alternate grounds because those grounds could have become the basis for a later appeal).

The Court must grant Petitioner's motion pursuant to § 2254 only if the state court's adjudication of Petitioner's claims on the merits:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Section 2254(d)(1) governs the review of legal error; § 2254(d)(2) applies to claims of factual error. *Gimotty v. Elo*, No. 99–2079, 2002 WL 745801, at *1 (6th Cir.

Apr.25, 2002) (citing *Weaver v. Bowersox,* 241 F.3d 1024, 1029 (8th Cir.2001)).

■ Under § 2254(d)(1), this Court may only grant Petitioner's motion if the state court arrived at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decided the case differently than the U.S. Supreme Court has on a set of materially-indistinguishable facts. *Friday v. Straub,* 175 F.Supp.2d 933, 936 (E.D.Mich. 2001) (Gadola, J.) (discussing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court's application of federal law contravenes § 2254(d)(1) "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Gimotty,* 2002 WL 745801, at *2 (quoting *Barker v. Yukins,* 199 F.3d 867, 872 (6th Cir.1999)).

Under § 2254(d)(2), a petitioner must prove by clear and convincing evidence that the state court's findings of fact were incorrect. *Id.; Cooey v. Coyle,* 289 F.3d 882, 907 (6th Cir.2002).

■ Before this Court may review a petitioner's arguments under § 2254, that petitioner must have exhausted state remedies for each issue. *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997). A petitioner need not, however, have raised issues on state collateral review that were adjudicated on direct appeal. *Id.*

For Petitioner's argument under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the operative order that this Court must review is the Circuit Court's order of November 23, 1998. For Petitioner's claim of ineffective assistance of trial counsel, this Court must review both the Circuit Court's order and the decision of the Michigan Court of Appeals dated March 12, 1996, each of which deals with specific aspects of Petitioner's position. For Petitioner's latter two arguments, insufficiency of the evidence and prosecutorial misconduct, the relevant order that this Court must review is the decision of the Michigan Court of Appeals dated March 12, 1996. As to the Circuit Court's order of November 23, 1998, which rejected Petitioner's *Brady* and failure-to-investigate claims on procedural and substantive grounds, Respondent first argues that review is barred because that order rests on an adequate and independent state ground. (Resp't Br. I at 11.)

■ A petitioner's claims are procedurally barred from federal review when a state court judgment denies relief because of the claimant's failure to meet a state procedural requirement, adequate and independent state grounds support that judgment, *Harris v. Reed,* 489 U.S. 255, 261, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), and the petitioner cannot establish cause and prejudice for the default. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Adequate and independent state grounds exist where "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris,* 489 U.S. at 263, 109 S.Ct. 1038 (internal quotation omitted). "In determining whether the state court clearly and expressly rested its conclusion upon procedural default, [a court must] look to the last state court disposition providing reasons for its decision." *McBee v. Abramajtys,* 929 F.2d 264, 267 (6th Cir. 1991).

The last state court disposition providing reasons for its decision was the Circuit Court's order of November 23, 1998. In that order, the Circuit Court clearly and expressly stated that its judgment rested on a state procedural default, writing that "[f]or the foregoing reasons, this Court finds that Defendant has not satisfied the requirements of MCR 6.508 and therefore *DENIES* Defendant's Motion for Relief

from Judgment." A state court's reliance on MCR 6.508 is an adequate and independent state procedural ground for denying relief. *Jones v. Toombs,* 125 F.3d 945, 947 (6th Cir.1997); *Winburn v. Curtis,* No. 99–CV–72667, 2000 WL 33244272, at *6 (E.D.Mich. Jan.31, 2000) (Hood, J.); *Richardson v. Elo,* 974 F.Supp. 1100, 1104 (E.D.Mich.1997) (Gadola, J.). Respondent argues that, accordingly, Petitioner must show either (1) cause and actual prejudice for her procedural default of her *Brady* and failure-to-investigate claims or (2) that failure to consider her claims would result in a miscarriage of justice. Authorities are split on this point.

There is authority for the proposition that where, as here, a petitioner has attempted to put forth an argument during a motion for relief from judgment under MCR 6.500, the district court should review the merits of the petitioner's argument during the petitioner's § 2254 proceeding without requiring the petitioner to establish cause and prejudice. In *Baker v. Stegall,* No. 94–1012, 1994 WL 443258 (6th Cir. Aug.16, 1994), the petitioner had failed to bring his ineffective assistance claim on direct appeal, raising the issue for the first time in his motion pursuant to MCR 6.500. *Id.* at *1. The state courts refused to review the petitioner's claim on the merits, reasoning that the petitioner had not shown "good cause" (presumably under MCR 6.508) for his failure to bring the ineffective-assistance contention on direct appeal. *Id.* at *2. When the petitioner attempted to raise his claim for ineffective assistance in a § 2254 action, the district court dismissed the ineffective-assistance argument because the petitioner had not shown cause and prejudice. *Id.* at *1.

On appeal, the Sixth Circuit vacated the district court's judgment, reasoning that the "district court improperly subjected [the petitioner's] petition to a cause and prejudice analysis," when it should have adjudicated the petitioner's ineffective-assistance argument on the merits. *Id.* at *1–2. *Baker* is on all fours with the case at bar and, if this Court were to follow *Baker,* it would have to reach the merits of Petitioner's contentions regardless of any cause and prejudice analysis.

In *Richardson,* on the other hand, the undersigned held that a petitioner must show cause and prejudice in order to overcome the state courts' reliance on MCR 6.508. *Richardson,* 974 F.Supp. at 1104–05. The Court assumes *arguendo* that *Richardson* is the better authority [6] and analyzes whether Petitioner can show cause and prejudice sufficient to overcome the state procedural bar of MCR 6.508. The Court first addresses cause.

■■ To demonstrate cause, "Petitioner must establish that 'some objective factor external to the defense impeded [her] efforts' to raise the claim" earlier. *Jackson v. United States,* 129 F.Supp.2d 1053, 1063 (E.D.Mich.2000) (Gadola, J.) (quoting *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)). On page nineteen of her initial brief, Petitioner bases her arguments for cause on several factors. The Court discussed the issue of cause with counsel during the hearing held on July 31, 2002. In light of that discussion and this Court's own research, the Court concludes that cause exists because Petitioner faced a Catch–22 regarding her *Brady* and failure-to-investigate arguments.

In the course of her direct appeal, Petitioner moved for a hearing pursuant to *People v. Ginther,* 390 Mich. 436, 212 N.W.2d 922 (1973).[7] Because this motion

---

6. Because *Baker* is unpublished, it is merely persuasive, and not binding, authority. *Ag-*

*new v. BASF Corp.,* 286 F.3d 307, 310 n.3 (6th Cir.2002).

7. "The purpose of a *Ginther* hearing is to

was denied, the direct review of the Court of Appeals was limited to the record at trial. *See, e.g., People v. Butler,* No. 226624, 2002 WL 1424416, at *2 (Mich.Ct. App. June 28, 2002). Given that the trial record did not provide Petitioner with the basis for a successful *Brady* or failure-to-investigate contention, Petitioner was effectively precluded from bringing these arguments on direct appeal.

Yet, in denying Petitioner's collateral attack, the Circuit Court rejected Petitioner's *Brady* and failure to investigate claims because she did not have cause under MCR 6.508 for not raising the issues on direct appeal. In other words, the state courts' message to Petitioner was essentially this: "You cannot claim a *Brady* violation or failure-to-investigate on direct appeal because those issues do not arise from the trial record, and you cannot argue those matters on collateral attack because you do not have cause for your failure to raise them on direct appeal." As applied in this case, the state procedural rules prevented Petitioner from raising effectively her *Brady* or failure-to-investigate claims until she reached this Court. In other words, Petitioner has established cause.

During oral argument, Respondent's counsel contended that Petitioner had not established cause. But for procedural inadequacies in the manner through which she moved for the *Ginther* hearing, Respondent argued, Petitioner could have obtained a *Ginther* hearing and then brought her *Brady* and failure-to-investigate claims on direct appeal. (HT III at 58–62.) Petitioner did not, so the argument goes, face the Catch–22 delineated above. The problem with Respondent's position is that the Court of Appeals denied Petitioner's motion for a *Ginther* hearing in a one-sen-

tence disposition (HT III at 62:7–9) that fails to establish why the Court of Appeals held that Petitioner failed to establish that she was entitled to a *Ginther* hearing, and the one-sentence disposition does not show that Petitioner had a realistic opportunity to bring either of these arguments on direct appeal. Respondent's arguments notwithstanding, this Court holds that Petitioner has established cause.

■ Having proven cause, Petitioner must now show prejudice. To prove the existence of prejudice, Petitioner must establish that the procedural default worked to her "actual and substantial disadvantage"; i.e., she must show that it infected her "entire trial with errors of constitutional dimensions." *Jackson,* 129 F.Supp.2d at 1063 (citing *United States v. Frady,* 456 U.S. 152, 170–71, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). To analyze prejudice, this Court must address the substance of Petitioner's arguments.

**A. Claim I: *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)**

■ The Due Process Clause of the Fourteenth Amendment requires that a state may not "deprive any person of life, liberty, or property, without due process of law." In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court established clearly that the Due Process Clause requires a state prosecutor to disclose evidence favorable to the defendant in a criminal case if that evidence is material to guilt or sentencing. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. In order for Petitioner to prove a *Brady* violation, she must establish that: (1) the relevant evidence was favorable to her; (2) the state suppressed the evidence; and (3)

allow the appellate court to determine the adequacy of trial counsel from the facts on the record." *People v. Tubisz,* No. 214498,

2000 WL 33407201, at *2 (Mich.Ct.App. Sept.1, 2000).

she suffered prejudice because of that suppression. *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir.2002) (discussing *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Petitioner must establish each of these elements by a preponderance of the evidence. *Mathis v. Berghuis*, 202 F.Supp.2d 715, 718 (E.D.Mich.2002) (Gadola, J.).

In her brief of May 2, 2000, Petitioner argues that there were seven instances in which the prosecution violated the *Brady* doctrine. To wit, Petitioner maintains that the prosecution suppressed: (1) a laboratory report determining that white powder and white chunk material found at Mr. Bernal's home tested negative for controlled substances; (2) a laboratory report showing that a gouge found in a false fingernail taken from Petitioner's garbage was the result of a manufacturing defect; (3) a laboratory report showing that no blood was on Petitioner's car door-panel and a pair of sneakers taken from Petitioner's auto; (4) a postcard that Mr. Bernal's ex-wife and her new husband allegedly sent him stating that she had just remarried; (5) a report identifying the results of a polygraph taken by Petitioner's ex-boyfriend, Bob Stone; (6) a policeman's notes taken during an interview with Mr. Bernal's newspaper deliveryman, Wesley Sibu; and (7) information that Sgt. Nowaczck learned during an interview of the school guidance counselor who met with Petitioner on the morning of the fire. In her brief of May 30, 2002, submitted after the close of discovery, Petitioner also puts forth three additional bases for her *Brady* argument: (1) that the prosecution failed to provide Petitioner with written records of neighborhood canvasses, thereby denying her access to potentially exculpatory witnesses; (2) that the prosecution failed to inform Petitioner that the police knew of, and investigated, other suspects in the murder; and (3) that the prosecution failed to provide Petitioner's counsel with hundreds of police reports. The Court shall analyze each of these pieces of evidence separately to determine whether each was exculpatory and suppressed. After conducting this analysis, the Court shall assess whether any exculpatory evidence that was suppressed, considered collectively, not item-by-item, prejudiced Petitioner. *See generally Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

**1. Were each of these pieces of evidence exculpatory and suppressed?**

**i. White powder and chunk material**

■ Petitioner argues that the prosecution suppressed lab reports showing that Mr. Bernal had white powder and white chunk material in his home on the day of the murder, and that these substances tested negative for narcotics. One of Petitioner's theories on habeas review is that Mr. Bernal was involved in drug dealing, and that his murderer was motivated by that involvement. The Circuit Court reasoned that Petitioner could not show that this evidence was exculpatory, because laboratory results indicated that the substances were not drugs. (Resp't Br. I at 16–17.) Respondent does not argue that the negative lab reports were not suppressed, but maintains that the Circuit Court was correct in asserting that these reports were not exculpatory. Petitioner retorts that this material would have constituted evidence that Mr. Bernal was dealing in fake narcotics.

As mentioned above, in addition to holding that Petitioner's *Brady* claim was procedurally barred, the Circuit Court also rejected the argument on the merits. It is thus not enough to conclude that this piece of evidence was exculpatory. For Petitioner to prevail on this point, the Court must conclude that this evidence was exculpatory *and* that the Circuit Court's con-

clusion to the contrary was contrary to or an unreasonable application of federal law as enunciated by the Supreme Court. McCambridge v. Hall, 2001 WL 1097770, at *2 (1st Cir.2001). Petitioner has not met this burden. Although, as a matter of first impression, this Court might have decided the issue differently, Petitioner has not proven that the Circuit Court's conclusion that the allegedly-false drugs were not exculpatory was contrary to or an unreasonable application of federal law *as determined by the Supreme Court.* This Court therefore rejects Petitioner's first basis for her *Brady* argument.

ii. **Laboratory report showing that a gouge found in a false fingernail taken from Petitioner's garbage was the result of a manufacturing defect**

██ The Circuit Court reasoned that this claim of non-disclosure did not aid Petitioner because "there is nothing to establish that the fingernail tip was Defendant's, how it was broken, or if it was even present at the scene of the crime. In addition, the medical examiner's testimony did not support the finding that the abrasions on the deceased were caused by a fingernail. This issue is irrelevant to Defendant's case and without merit." Respondent echoes the Circuit Court's position, and also argues that there is no evidence of suppression because Petitioner knew of the information in the report. (Resp't Br. I at 18–20.)

Petitioner argues that "[h]ad the defense known that the broken fingernail tip was a manufacturing defect, counsel could have responded effectively to the prosecution [sic] argument that Ms. Hargrave–Thomas broke her nail that night while committing this crime." (Pet'r Br. I at 39.) However, given that Judge Baxter expressly declined to conclude that the scratch marks on Mr. Bernal's chest were

fingernail marks (TT VI at 57:6–7), the Court concludes that the suppression of this piece of evidence would not have resulted in a sliver of prejudice to Petitioner and thus cannot support Petitioner's *Brady* claim.

iii. **Laboratory report showing that no blood was on Petitioner's door panel and a pair of sneakers taken from Petitioner's auto**

The Circuit Court reasoned, and Respondent now contends, that "[t]he defense stipulated to this finding [that there was no blood on the panel or sneakers] at trial, therefore, this issue is irrelevant." This Court agrees.

Well before Judge Baxter made her findings of fact or conclusions of law, the parties agreed that there was no blood on the door panel or sneakers. The Court fails to see, therefore, how the non-disclosure of this evidence could possibly have been exculpatory. The Court assigns no weight to this aspect of Petitioner's argument.

iv. **The postcard that Mr. Bernal's ex-wife and her new husband allegedly sent him stating that they had just married**

██ Petitioner contends that the prosecution suppressed a postcard allegedly from Mr. Bernal's ex-wife, Diane Williams, and her new husband, Randy Williams. Petitioner argues that this postcard is significant because Mr. Williams was a neighbor of Mr. Bernal's, and this romantic triangle allegedly led to tension among the three.

The front of the postcard in question has a photo of a car with a "just married" sign. The back of the card reads "Just thought you'd like to know." The card is unsigned, and has no return address. The Circuit Court reasoned that Petitioner's attempt to argue that the postcard was an attempt

to upset Mr. Bernal and evinced a motive for someone else to hurt him was "absurd" because "[t]here is nothing to confirm Defendant's speculation" and because the postcard "merely informs." Respondent agrees with the Circuit's Court's reasoning. (Pet'r Br. I at 13.) So does this Court. This Court fails to see how the postcard was in any sense exculpatory and therefore concludes that this argument does not aid Petitioner.

### v. The report identifying the results of a polygraph taken by Petitioner's ex-boyfriend, Bob Stone

Petitioner argues that her ex-boyfriend, Bob Stone, allegedly failed a polygraph regarding Mr. Bernal's murder and that the prosecution suppressed evidence of this polygraph. The problem with Petitioner's position is that information is not relevant for *Brady* purposes unless that information is, or would lead directly to, evidence admissible at trial. *United States v. Phillip*, 948 F.2d 241, 249–50 (6th Cir.1991). The former criterion does not exist: under the law of Michigan, reference to a polygraph is inadmissible at trial, even where the finder of fact is a judge and not a jury. *People v. Hurst*, No. 230517, 2002 WL 550462, at *3 (Mich. App. Apr.12, 2002); *see also People v. Nash*, 244 Mich.App. 93, 97, 625 N.W.2d 87 (2000).

It is at least conceivable that the allegedly-suppressed polygraph results might form the basis of a *Brady* violation if Petitioner could establish that the results could have led directly to admissible evidence. *Compare Watkins v. Miller*, 92 F.Supp.2d 824, 851–52 (S.D.Ind.2000) (reasoning that, under *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), an inadmissible polygraph result could form the basis for a *Brady* challenge), *with Moon v. Head*, 285 F.3d 1301, 1312 (11th Cir.2002) (reaching the opposite conclusion). Petitioner, however, has failed to show how the results of Mr. Stone's polygraph could have led directly to admissible evidence. Instead, Petitioner offers the conclusory allegation that "[h]ad the defense known that this polygraph examination existed and been provided with the information ascertained during the course of this examination, counsel would have been able to prepare a stronger case that Bob Stone was responsible for Mr. Bernal's death." (Pet'r Br. I at 30.) A bald assertion, however, is insufficient to warrant relief under *Brady*. *See Cruz v. Artuz*, No. 97–CV–2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002). The Court thus accords no weight to the allegedly suppressed polygraph.

### vi. A policeman's notes taken during an interview with Mr. Bernal's newspaper deliveryman, Wesley Sibu

During the course of his investigation, Petitioner had informed Sgt. Nowaczck that she believed that her ex-boyfriend, Bob Stone, should be a suspect in Mr. Bernal's murder. (Nowaczck Dep. at 101.) Petitioner had told Sgt. Nowaczck that Mr. Stone was a "looney," that he had been stalking and threatening her since the break-up, and that he had a history of impersonating a police officer. (Nowaczck Dep. at 102.) Buttressing the latter assertion are two items. First is a letter from the City of South Lyon's Chief of Police, Gerald L. Smith to Mr. Stone (with a copy to another police chief), to the effect that Chief Smith had heard a "rumor" that Mr. Stone was falsely claiming to be a South Lyon policeman and that, if this rumor were true, Mr. Stone should cease to make such a claim. Second is the affidavit of the office manager in the dentist's office where Petitioner worked, Deborah Smulsky, to the effect that Mr. Stone had also falsely represented to her that he was a South Lyon police officer.

According to Petitioner, the prosecution suppressed crucial evidence regarding Mr. Stone. This evidence was a police officer's notes taken after a discussion with Mr. Bernal's newspaper deliveryman, Wesley Sibu. Now that discovery is closed, however, it is apparent that the information that Mr. Sibu spoke with police was not exculpatory. During discovery Petitioner took the deposition testimony of Sgt. Jon Handzlik. Sgt. Handzlik stated that he had spoken with Mr. Sibu on the day of the murder. (Handzlik Dep.[8] at 11–12.) Sgt. Handzlik also testified, however, that Mr. Sibu had told him that "he didn't notice anything unusual" at roughly 4:30 a.m. on the day of the murder.

In short, there is no evidence that the prosecution suppressed any exculpatory information that police had gained from Mr. Sibu. The Court affords no weight to this aspect of Petitioner's *Brady* argument.

### vii. Information Sgt. Nowaczck gained during an interview of the school guidance counselor who met with Petitioner on the morning of the fire

■ Petitioner maintained throughout the investigation of Mr. Bernal's murder that she had met with her son's guidance counselor, Dennis Hewitt, at 7:30 a.m. on October 11. Petitioner contends that Sgt. Nowaczck interviewed Mr. Hewitt shortly after the murder and (1) confirmed Petitioner's claim that she had met with Mr. Hewitt and (2) learned from Mr. Hewitt that Petitioner behaved in a normal, calm manner "merely 90 minutes after she was alleged to have murdered her boyfriend and set fire to his house." (Pet'r Br. II at 7.) Petitioner now argues that Sgt. Nowaczck failed to disclose what he learned from Mr. Hewitt to defense counsel, and

that this failure constitutes a *Brady* violation. Petitioner further maintains that "[t]his information would have allowed Petitioner to confirm her statements to police and undermine Nowaczck's claim that she was less than truthful in his interviews of her." (Pet'r Br. II at 7.)

The problem with Petitioner's position is that, assuming that Sgt. Nowaczck did suppress this information, she is unable to show that one iota of prejudice flowed from that suppression. Petitioner knew from her own memory that she had spoken with Mr. Hewitt at 7:30 on the morning of the murder and she should have known that Mr. Hewitt would probably be able to testify as to her mental state at that time. That is to say, Petitioner was aware well before trial of the very exculpatory information that she now argues Sgt. Nowaczck kept hidden from her. This alleged non-disclosure therefore contributes nothing to Petitioner's *Brady* argument.

### viii. Written records of neighborhood canvasses that permanently denied Petitioner access to potentially exculpatory witnesses

■ During the course of discovery, Petitioner learned that Sgt. Nowaczck, during the investigation of Mr. Bernal's murder, "canvassed the deceased's neighborhood and made reports," and that Sgt. Nowaczck documented most of the contacts he made in that neighborhood. (Pet'r Br. II at 9; Nowaczck Dep. at 49.) Petitioner adduces the affidavit of Attorney Rene Cooper to the effect that the police never disclosed this documentation to Petitioner. (Pet'r Supp. Ex. 3.) Petitioner argues that, had she been provided with these documents before trial, "she could have tracked down exculpatory evidence herself."

---

**8.** "Handzlik Dep." refers to the deposition that Petitioner's counsel took of Sgt. Handzlik on February 22, 2002 and that is provided as

Exhibit 6 to Petitioner's Supplemental Exhibits, filed on May 30, 2002.

Because Petitioner had failed to demonstrate, either in writing or during the course of hearings before this Court, how these documents would have led to exculpatory evidence, or what the value of that evidence would have been, the Court affords no weight to this aspect of Petitioner's *Brady* argument.

**ix. Prosecution's failure to inform Petitioner that police knew of, and investigated, other suspects in the murder**

 Petitioner lists five people whom, she argues, police identified as suspects during the investigation, but whom the prosecution failed to disclose before trial: Bob Stone, Diane Williams, Randy Williams, Ed Ochal, and Mike Hill.

The problem with Petitioner's position is that information is not relevant for *Brady* purposes unless that information is, or would lead directly to, evidence admissible at trial. *Phillip*, 948 F.2d at 249–50. Where, as here, defense counsel had the opportunity to cross-examine the investigating officer thoroughly at trial, information in the possession of the police as to the existence of other suspects is inadmissible hearsay. *See People v. Herndon*, 246 Mich.App. 371, 633 N.W.2d 376, 401–02 (2001). This information would still be relevant for *Brady* purposes if it would have led directly to admissible evidence favorable to the defense. Nowhere in her written or oral submissions to this Court, however, has Petitioner established that this information would have led directly to such evidence. Therefore, this Court holds that information concerning the five other suspects does not contribute to Petitioner's *Brady* argument.

**x. Prosecution's failure to provide Petitioner's counsel with hundreds of police reports**

 Petitioner contends in her supplemental brief that the prosecution's withholding of 544 pages of police reports denied her a right to a fair trial. Petitioner fails, however, to explain what within these reports would have been exculpatory. This argument thus fails to aid Petitioner's *Brady* challenge.

**2. Did Petitioner suffer prejudice under *Brady*?**

Prejudice exists under *Brady* if, considering the suppressed, exculpatory evidence as a whole in light of the other evidence adduced at trial, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555. The Court's independent examination of Petitioner's *Brady* claim reveals one piece of evidence that was arguably exculpatory, suppressed, and capable of contributing to prejudice: the lab reports concerning the allegedly-fake drugs in Mr. Bernal's home. Considering that evidence in the light of the inculpatory evidence discussed above, however, this Court sees no reasonable probability that the outcome of the proceeding would have been different with the inclusion of such evidence.

For the reasons set forth above, this Court holds that: (1) Petitioner has failed to show prejudice sufficient to overcome the adequate-and-independent-state-ground doctrine; and, (2) in the alternative, Petitioner's *Brady* argument fails on the merits.

**3. Miscarriage of Justice**

 Petitioner argues that the miscarriage-of-justice exception requires this Court to consider her *Brady* arguments regardless of any procedural default. (Pet'r Br. I at 19, n.4.) This Court would consider Petitioner's defaulted claims if she were to demonstrate that a miscarriage of justice would result from failure to consider the merits of those claims. *Richardson*, 974 F.Supp. at 1105. This doc-

trine applies where a constitutional violation resulted in the conviction of one who is actually innocent. *Id.* (citing *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Murray,* 477 U.S. at 496, 106 S.Ct. 2639). For reasons stated above, however, a consideration of Petitioner's *Brady* arguments on the merits would be unavailing and would thus fail to establish that Petitioner, as a matter of fact, did not kill Mr. Bernal.

### B. Claim II: Ineffective Assistance of Counsel

To show that her counsel were constitutionally ineffective, Petitioner must prove that (1) counsel's performance was deficient and (2) "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "strong presumption" exists that counsel afforded the defendant reasonable professional assistance. *Id.* To show prejudice, Petitioner must establish that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Id.*

Petitioner argues that trial counsel were ineffective because of their failure to: (1) investigate adequately or present witnesses; (2) file motions to suppress; and (3) object when the prosecution commented on Petitioner's exercise of her rights under the Fourth and Sixth Amendments. (Pet'r Br. I at 50.) The Circuit Court rejected the first contention in its order of November 23, 1998, and the Michigan Court of Appeals rejected the latter two arguments in its order of March 12, 1996. The Court considers each of these grounds seriatim.

9. At trial, two lawyers represented Petitioner.

### 1. Failure to Investigate or Present Witnesses

 Regarding counsel's allegedly-inadequate investigation, the Circuit Court reasoned thus:

Defendant's last claim in support of her motion is ineffective assistance of counsel due to failure to investigate possible defenses and witnesses. Pursuant to Michigan law, there is a presumption of effective assistance of trial counsel and the defendant has the burden of proving otherwise. *People v. Tommolino,* 187 Mich.App. 14, 466 N.W.2d 315 (1991). This presumption can be overcome by showing that counsel's performance fell below an objective standard of reasonableness and that the representation by counsel so prejudiced the defendant as to deprive him of a fair trial. *People v. Pickens,* 446 Mich. 298, 338, 521 N.W.2d 797 (1994). Where a defendant alleges a specific mistake by counsel resulting in the denial of effective assistance of counsel, the test employed is whether in a trial free of mistake, the defendant would have had a reasonably likely chance of acquittal. *People v. Garcia,* 398 Mich. 250, 254, 247 N.W.2d 547 (1976).

Defendant fails to rebut the presumption of effective assistance of trial counsel. Defendant alleges that trial counsel was [sic] [9] ineffective due to failure to investigate and in particular, failure to investigate issues presented in this Motion. *Such actions do not constitute ineffective assistance of counsel.* It has been held that "error or inadvertence is not cause for procedural default in post-conviction proceedings." *Reed,* 379 Mich. at 384, citing *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Moreover, this court will not second-guess the strategy of trial coun-

sel. Defendant's claim of ineffective assistance of trial counsel is without legal basis. (Emphasis added.)

Although the Circuit Court did not refer directly to *Strickland,* it essentially applied the standard that the Supreme Court enunciated in *Strickland.* This Court must therefore disturb the Circuit Court's ruling only if (1) the Circuit Court's decision was incorrect and (2) the Circuit Court had applied clearly-established federal law, as enunciated by the Supreme Court, unreasonably. *Welch v. Burke,* 49 F.Supp.2d 992, 1010 (E.D.Mich.1999) (Cleland, J.).

 The Court turns to prong one of *Strickland,* and asks whether trial counsel engaged in deficient representation. During this Court's evidentiary hearing, Attorney Cooper admitted a complete failure to interview any potential witnesses or conduct an investigation before trial. (HT II at 11–16.) Mr. Cooper's explanation for his inaction was that he was "cocky" (HT II at 21:3–5), that he thought the prosecution had a "terribly weak" case consisting entirely of circumstantial evidence, and that it was thus unnecessary to investigate potential witnesses. (HT II at 66:18–25.)

Attorney Venditelli likewise admitted that he had failed to interview any witnesses or conduct any other type of investigation before Petitioner's trial for first degree murder and burning a dwelling house. (HT I at 94:24–25.) Mr. Venditelli's excuse for his listlessness was that he never considered Petitioner to be his client, but merely his potential client.[10]

This Court holds that Petitioner has proven prong one of the *Strickland* test. At a bare minimum, a lawyer must "interview potential witnesses and ... make an independent investigation of the facts and circumstances in the case." *Bryant v. Scott,* 28 F.3d 1411, 1415 (5th Cir.1994) (internal quotation omitted). Neither of Petitioner's trial counsel did so; instead, defense counsel were supine. They chose not to investigate or call any potential witnesses, and decided to present no defense theory. Counsel made these decisions not because of any strategic or tactical assessment of the case. Instead, Attorney Cooper[11] chose this path simply because he was "cocky" about his chances for success and he thought the prosecution's case was "terribly weak." Attorney Venditelli made this decision because he was somehow unsure as to whether Petitioner was his client. Accordingly, the defense attorneys' performance fell far outside of the wide range of professionally competent assistance. *See United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 657–58 (7th Cir.1984) (holding that out of hand rejection of potential witnesses because the prosecution's case was "so weak" fell below minimum standards of competence); *Matthews v. Abramajtys,* 92 F.Supp.2d 615, 637–38 (E.D.Mich.2000) (Tarnow, J.) (reasoning that failure to interview alibi witnesses or present a defense theory, and relying solely on the weakness of the prosecution's case, constituted deficient representation); *see also Chambers v. Armontrout,* 907 F.2d

**10.** This assertion is preposterous. The trial transcript indicates that Mr. Venditelli was "[a]ppearing on behalf of the Defendant Kyleen [sic] Hargrave–Thomas" (TT I at 1), Mr. Cooper announced at the outset of the trial that "Renee [sic] Cooper and Nick Venditelli [were appearing] for the Defendant," (TT I at 8:13–14), and Attorney Venditelli sat at the counsel table during the trial (HT I at 94:9–10.)

**11.** Attorney Cooper has professional problems that go far beyond this case. *See http://www. adbmich.org/01–03.htm # 98–141–GA; http:// www.adbmich.org/C-Chart.htm; People v. Cooper,* 461 Mich. 912, 604 N.W.2d 66, 66–68 (1999) (Corrigan, J., dissenting). It aston-

825, 828–31 (8th Cir.1990) (reasoning that counsel's failure to interview or present key potential witnesses in support of a viable theory of defense fell outside of the wide range of professionally competent assistance); *Harris v. Reed*, 894 F.2d 871, 878–79 (7th Cir.1990) (same).

■ Having concluded that Petitioner has proven that defense counsel's performance was deficient, this Court must ascertain whether Petitioner has established prong two of the *Strickland* test: i.e., the Court must decide whether Petitioner has shown that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.

■ In deciding whether prejudice resulted from defense counsel's failure to investigate and present evidence, this Court must compare the evidence presented to the trial court with the evidence that might have been presented had the defense attorneys conducted a reasonable investigation. *Klvana v. California*, 911 F.Supp. 1288, 1295 (C.D.Cal.1995). Only if the presentation of such evidence probably would have resulted in a different outcome would Petitioner's failure-to-investigate claim warrant relief under *Strickland. Id.*

The evidence linking Petitioner to Mr. Bernal's murder was, as noted by the trial court (TT V at 57:6–7) and by the prosecuting attorney (HT II at 123:14), entirely circumstantial and was, in the opinion of this Court, less than overwhelming. As to

motive, the prosecution adduced evidence that Mr. Bernal had disappointed Petitioner's expectations of marriage and she had killed him for that reason. Had defense counsel interviewed Petitioner's ex-co-worker and friend, Deborah Smulsky, however, Ms. Smulsky could have testified that Petitioner had stated on October 10, 1991 that Mr. Bernal had proposed marriage on October 9. (Smulsky Aff.[12] at ¶ 9.) Such testimony would have been relevant to Petitioner's alleged motive, or state of mind, inasmuch as it would have tended to show that Petitioner had every reason to want Mr. Bernal alive, not dead. Ms. Smulsky asserts, and this Court finds, that she told Petitioner prior to the trial that she was willing to testify.

Regarding opportunity, the prosecution adduced evidence that Petitioner killed Mr. Bernal,[13] and that she set fire to Mr. Bernal's house between 5:30 and 6:45 a.m. on October 11 (TT II at 139). Had defense counsel interviewed [14] Petitioner's children about the events of October 11, 1991, however, they could have adduced evidence showing that Petitioner had at least a partial alibi. John Neville Hargrave–Thomas II could have testified that his mother woke him at 6:15 a.m. on October 11, and that her behavior was ordinary and calm when she did so. (John Aff.[15] at ¶¶ 1–7.) In a similar vein, Nathan Hargrave–Thomas could have testified that his mother woke him at 6:30 a.m., and that she

ishes the Court that Mr. Cooper continues to practice law.

**12.** "Smulsky Aff." refers to the affidavit of Deborah Smulsky, attached as exhibit X to Petitioner's exhibits filed on May 2, 2000.

**13.** The time frame within which Petitioner allegedly stabbed Mr. Bernal is unclear from the trial transcripts, but Respondent's current position is that "Mr. Bernal was stabbed on— shortly after 5 a.m. in the morning." (HT III at 76:22–23.)

**14.** Although Attorney Cooper's testimony was that he interviewed no potential witness, in his affidavit John states that Mr. Cooper did speak with him solely about Mr. Bernal's garage-door opener. In any event, Mr. Cooper never asked Petitioner's children the most obvious questions: "At what time did your mother wake you on October 11?" "Was she acting out of the ordinary when she did so?"

**15.** "John Aff." refers to the affidavit of John Neville Hargrave–Thomas II, attached as exhibit O to Petitioner's exhibits filed on May 2, 2000.

was acting normally when she did so. (Nathan Aff.[16] at ¶¶ 1–2.)

Had the finder of fact credited this testimony, there would have been at least two important results. First, the window of time within which Petitioner conceptually could have committed the arson would have been nearly cut in half: Petitioner would have had to have set the fire after 5:30 and sometime before she returned to her home (which counsel stipulated (HT III at 76:3–13) was 2.4 miles from Mr. Bernal's home) and woke John at 6:15. Although this conclusion would not be dispositive, it would have made a factfinder much less likely to decide beyond a reasonable doubt that Petitioner committed arson.

To conclude that Petitioner committed arson *and* that she set the fire earlier than 6:15, a factfinder would have had to have believed that the fire burned for at least forty-five minutes and as much as an hour and a half before it was reported—despite the testimony of a neighbor who stated that he noticed that Mr. Bernal's garage door was open between 6:15 and 6:20 (TT II at 28:16), but did not apparently notice any smoke coming from the home at that time.[17] In short, had defense counsel interviewed the obvious potential witnesses, they could have adduced testimony from Petitioner's children that, if believed, would have made it far less probable, in the mind of the factfinder, that Petitioner would have had the time to set fire to Mr. Bernal's home.

There is a second reason that the testimony that Petitioner's children could have provided, if believed, would have been highly exculpatory. This evidence would have shown that, as early as 6:15 a.m. on October 11, Petitioner's demeanor was calm, and Petitioner was behaving normally—despite the prosecution's theory that Petitioner had just stabbed her lover through the heart, set aflame his corpse and, presumably, slept very little. It is possible that Petitioner's demeanor was composed after she committed a crime of paramount brutality. A factfinder who believed that Petitioner was calm shortly after the arson and murder, however, would have been less likely to conclude that Petitioner was the guilty party. One would expect a person who had just left the scene of her own acts of arson and first-degree murder to be agitated, not calm. *Cf. Commonwealth v. Youngblood,* 241 Pa.Super. 72, 359 A.2d 456, 458 (1976) (reasoning that one who had just fled the scene of a crime would be agitated).

Other evidence that a reasonable investigation by defense counsel could have uncovered would have buttressed the point. Had counsel interviewed Dennis Hewitt, the school guidance counselor with whom Petitioner met on October 11, 1991, they could have presented Mr. Hewitt's testimony to the effect that Petitioner arrived on time for her 7:30 a.m. appointment with him, and that she "did not seem at all upset or agitated when" Mr. Hewitt met with her. (Hewitt Aff. at ¶¶ 1–6.) Had this testimony been believed, it would have been exculpatory insofar as it suggested that Petitioner was functioning normally a short while after she was supposed to have murdered and partially incinerated a man whom she had recently intended to marry.

It is undisputed that Petitioner, who was employed at the office of a dentist, was present at her place of employment on the

---

16. Nathan Aff. refers to the affidavit of Nathan Hargrave–Thomas, attached as exhibit N to Petitioner's exhibits filed on May 2, 2000.

17. It is not clear from the record exactly what time the fire department was called, but emergency personnel responded to Mr. Bernal's address at approximately 7:13 a.m. (TT I at 33:12–15.)

morning of the murder and arson. Nevertheless, Attorney Cooper admitted at this Court's evidentiary hearing that he had failed to interview Petitioner's co-workers, any patients who came to the office that morning, or the dentist who employed Petitioner, as to her composure and demeanor that morning.

A reasonable investigation by defense counsel also could have led to presentation at trial of the testimony of Wesley Sibu. Mr. Sibu was a witness at Petitioner's preliminary examination on the murder and arson charges but, inexplicably, was not called as a defense witness at the trial. According to Mr. Sibu's affidavit and testimony during the preliminary examination, he delivered the Detroit Free Press in Mr. Bernal's neighborhood beginning roughly in January, 1991 and continuing through the morning of the murder. (Sibu Aff.[18] at ¶ 2.) Mr. Sibu claimed that, at around 4:30 on the morning of the murder, he "saw Mr. Bernal's garage door three-quarters of the way open, and [he] saw a man in uniform. [Mr. Sibu] had the impression that the man in uniform was a police officer, but he could have been a fireman." (Sibu Aff. at ¶ 3.) Mr. Sibu further maintained that the man in uniform told him that "there had been a little fire" at Mr. Bernal's house. (Sibu Aff. at ¶ 4.)

According to Mr. Sibu, he returned to Mr. Bernal's home at 9:00 a.m. to see whether Mr. Bernal still wanted the newspaper delivered to his home after the fire. (Sibu Aff. ¶ at 6.) Mr. Sibu claimed that he then talked to a detective who emerged from Mr. Bernal's home, that he told the detective that he had seen a man in uniform that morning at 4:30, and that the detective asked Mr. Sibu whether the man in uniform was wearing a Novi police uniform. (Sibu Aff. at ¶ 6.) Mr. Sibu asserted that he talked with police again on the afternoon of October 11. (Sibu Aff. at ¶ 7.)

The Court turns to the question of whether Mr. Sibu's testimony would have aided Petitioner. The Court notes that, if Mr. Sibu's affidavit and testimony at the preliminary examination are to be believed, the man in uniform must have been connected to the murder. This is so because the man knew of the fire as early as 4:30 a.m., long before any legitimate, uniformed fireman or policeman had been alerted to the blaze in Mr. Bernal's house. Information that a mystery fireman or policeman was at Mr. Bernal's home at 4:30 a.m. and knew of the fire is wholly inconsistent with the prosecution's theory that Petitioner acted alone in murdering Mr. Bernal. This is especially significant considering that a potential suspect, Robert Stone, may have been falsely representing himself as a police officer.

Mr. Cooper knew of this potential testimony well before trial. At the preliminary examination, Mr. Sibu testified that, on the day of the murder, he had spoken with a policeman at 4:30 a.m. (PE [19] at 108). Mr. Sibu further testified that the officer had said that "[t]here had been a fire" at Mr. Bernal's home. (PE at 108:21.) Petitioner's attorney Rene Cooper was present at the preliminary examination (PE at 110), and nonetheless chose not to call Mr. Sibu as a witness at trial. (TT III at 95:6–13.) Thus, Petitioner's trial counsel knew the essence of Mr. Sibu's recollection of the events of October 11, 1991 before trial.

During this Court's evidentiary hearing, Attorney Cooper testified that he decided not to call Mr. Sibu as a witness at trial because, during the course of Mr. Sibu's

18. "Sibu Aff." refers to the affidavit of Wesley Sibu, attached as exhibit W to Petitioner's exhibits filed on May 2, 2000.

19. "PE" refers to the transcript of the preliminary examination, an excerpt of which is attached as exhibit FF to Petitioner's exhibits filed on May 2, 2000.

testimony at the preliminary examination, it became apparent to Mr. Cooper that Mr. Sibu was "clearly a developmentally disabled individual." If this Court credited Mr. Cooper's testimony, it would conclude that Mr. Cooper's decision not to call Mr. Sibu to the stand was a tactical decision within the broad range of competent representation. This Court, however, does not credit Attorney Cooper's testimony.[20] Instead, this Court finds as a matter of fact that Mr. Cooper failed to call Mr. Sibu as a witness simply because he had not investigated Mr. Sibu's potential testimony and therefore never made a professional decision as to whether Mr. Sibu's version of events would have been credible.

The Court reaches this conclusion because, after hearing Mr. Sibu's testimony at the preliminary examination, Mr. Cooper decided to call Mr. Sibu as a witness at trial. (HT II at 133:11–15.) Mr. Cooper, as he admitted, never conducted any interview or other investigation of Mr. Sibu that could have changed his mind as to the utility of Mr. Sibu's potential testimony. Mr. Cooper required Mr. Sibu to be present at trial as a potential witness. And yet, at trial, this discussion took place among the court and counsel:

> THE COURT: Let's go through the exhibits.
>
> MR. REYNOLDS: Also, just for the record upon request of Counsel I did have a witness Wesley Sibu, S-i-b-u subpoenaed to appear at these proceedings today. He is present and I just—it's my understanding Counsel at this time felt there was no need to call him and he can be released at this time.

> MR. COOPER: I don't care what he does with him. *I don't know why he's bringing it up.*
>
> MR. REYNOLDS: I don't want to release somebody and then have to call him back, that's all.
>
> MR. COOPER: I don't want him.

(TT III at 95:5–16 (emphasis added).) It is apparent from this colloquy that Mr. Cooper was, at trial, unaware of the significance of any testimony that Wesley Sibu could have provided. Attorney Cooper's alternative explanation of events—that he decided not to call Mr. Sibu because Mr. Sibu was developmentally disabled—is incredible. To believe Mr. Cooper's explanation, this Court would have to conclude that: (1) Mr. Cooper heard Mr. Sibu's testimony at the preliminary examination; (2) based on that testimony, Mr. Cooper chose to call Mr. Sibu as a witness; (3) Attorney Cooper required Mr. Sibu to be physically present at trial; but (4) all along, Mr. Cooper knew that Mr. Sibu was "developmentally disabled" and therefore Mr. Cooper did not intend to call him as a witness.

This Court finds it far more likely that Mr. Cooper decided, after the preliminary examination, to call Mr. Sibu as a witness. The Court also finds, however, that because Attorney Cooper failed to interview or otherwise prepare this (or any other) potential witness, he had simply forgotten about Mr. Sibu at trial. In short, this Court concludes that defense counsel did not make a reasoned decision not to adduce the testimony of Wesley Sibu. Rather, defense counsel failed to put Mr. Sibu on the stand for the same reason that they failed to adduce any other evidence: their utter failure to investigate or prepare po-

---

**20.** Mr. Sibu is dead, and Mr. Reynolds submits that he would not know Mr. Sibu in a "crowd of two." (HT II at 132:16). Aside of Attorney Cooper's characterization of Mr. Sibu's mental state as developmentally disabled, the Court has no information as to Mr. Sibu's faculties circa 1993.

tential witnesses for trial. This Court therefore shall weigh the testimony that Mr. Sibu could have adduced at trial. As discussed above, Mr. Sibu's testimony would have been wholly incompatible with the prosecution's theory of events and, if believed, would likely have resulted in Petitioner's acquittal.

Considering the totality of the evidence that a reasonable investigation of potential witnesses would have allowed defense counsel to put forth, as weighed against the inculpatory evidence that the prosecution actually adduced, this Court holds that Petitioner has established the element of prejudice. It is likely that, given the circumstantial and underwhelming nature of the prosecution's case, the exculpatory circumstantial evidence that a competent investigation of potential witnesses would have uncovered would have led a factfinder to acquit Petitioner.

█ Petitioner has proven that she suffered ineffective assistance of trial counsel, and that counsel's incompetence prejudiced her. Accordingly, the Court must decide whether the Circuit Court's decision to the contrary was an unreasonable application of clearly-established federal precedent as enunciated by the Supreme Court prior to the Circuit Court's decision. *Bailey v. Mitchell,* 271 F.3d 652, 655 n. 6 (6th Cir.2001). The Circuit Court reasoned, as discussed above, that failure to investigate, per se, could not establish ineffective assistance. This conclusion was a wholly unreasonable application of Supreme Court precedent existing before the Circuit Court reached its conclusion. As the Supreme Court held in 1986: lawyers have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and failing to meet that duty could constitute ineffective assistance. *Kimmelman v. Morrison,* 477 U.S. 365, 385–86, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (in-

ternal quotation omitted); *see also Williams,* 529 U.S. at 395–98, 120 S.Ct. 1495; *Groseclose v. Bell,* 130 F.3d 1161, 1169–71 (6th Cir.1997) *Austin v. Bell,* 126 F.3d 843, 848 (6th Cir.1997); *Glenn v. Tate,* 71 F.3d 1204, 1207–11 (6th Cir.1995); *Lewis v. Alexander,* 11 F.3d 1349, 1352–53 (6th Cir.1993). It was thus beyond the pale for the Circuit Court to brush off Petitioner's failure-to-investigate claim by stating that "[s]uch actions do not constitute ineffective assistance of counsel."

Petitioner has proven that: (1) cause exists for not adducing the failure-to-investigate argument earlier than she did; (2) trial counsel were deficient for their failure to investigate; (3) but for that deficiency she would have been acquitted; and (4) the Circuit Court's determination to the contrary on November 23, 1998 was an unreasonable application of clearly established federal law as enunciated by the Supreme Court. This Court therefore holds that: (1) cause and prejudice excuse Petitioner's procedural default under MCR 6.508; and (2) Petitioner suffered ineffective assistance of trial counsel because of their failure to investigate. Accordingly, this Court shall order that Petitioner either be granted a new trial or released from custody. *See Warner v. United States,* 975 F.2d 1207, 1215 (6th Cir.1992).

**2. Failure to file motions to suppress and object when the prosecution commented on Petitioner's exercise of her rights under the Fourth and Sixth Amendments**

As to the remaining bases of Petitioner's ineffective-assistance contention, the Court of Appeals reasoned as follows:

Finally, defendant argues that she was denied the effective assistance of counsel when counsel failed to move to suppress all identification testimony and statements made by defendant. With

respect to the statements made by defendant, she claims that counsel should have moved to suppress the statements on the basis of a violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the record does not establish that defendant was in custody at the time she made the statements and, therefore, does not establish that the statements should have been suppressed. Accordingly, defendant cannot demonstrate that she was prejudiced by counsel's failure to move for suppression. *See People v. Tommolino*, 187 Mich.App. 14, 466 N.W.2d 315 (1991). Similarly, we are not convinced by defendant's argument that her statements were irrelevant and should have been excluded on relevancy grounds or that the trial court improperly considered those statements as a result.

Defendant also argues that counsel was [sic] ineffective for failing to move to suppress all identification testimony. However, we are not persuaded that a motion to suppress would have been successful or that the trial court would have reached a different conclusion had such a motion been successful. Accordingly, defendant has not established prejudice by counsel's conduct. *Tommolino, supra.*

On pages 58 through 66 of her first brief, Petitioner argues that trial counsel were ineffective for failing to move to suppress (1) the identification testimony of Marymargaret Brown and (2) Petitioner's non-Mirandized statements to police. She also argues that trial counsel were ineffective because of their "failure to object when the prosecution brought out evidence that Ms. Hargrave–Thomas exercised her Fourth And Sixth Amendment rights."

### i. identification testimony

■ Petitioner contends that her trial counsel should have kept Marymargaret Brown's testimony about seeing Petitioner

from being introduced as evidence. The crux of Petitioner's position is that such evidence was tainted by a pre-trial identification process that was "impermissibly suggestive." (Pet'r Br. I at 58.) The Court of Appeals reasoned as follows on this point: "we are not persuaded that a motion to suppress would have been successful or that the trial court would have reached a different conclusion had such a motion been successful. Accordingly, defendant has not established prejudice by counsel's conduct."

■ Due process requires that a conviction be vacated when it is based on pretrial identification procedures that are so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 890 U.S. 377, 384 (1968). The linchpin of this analysis is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). To determine whether the pretrial identification process was sufficiently reliable, one must assess: (1) whether the process was unduly suggestive; and (2) if so, whether, considering the "totality of the circumstances," the identification was nonetheless supported by "sufficient independent indicia of reliability." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir.1986) (citing *Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

Assuming *arguendo* that the photo lineup and Sgt. Nowaczck's use of the book of female hairstyles were impermissibly suggestive in this case, there were still sufficient indicia of reliability underlying Ms. Brown's identification of Petitioner that it was not an unreasonable application of federal law for the Court of Appeals to rule as it did.

These indicia include: Ms. Brown's unequivocal in-court identification of Petition-

er (TT II at 135:14); evidence that Ms. Brown had a substantial opportunity to view the driver who almost hit her truck on October 11, 1991 (TT II at 113–15); and, that Ms. Brown gave a detailed description of the driver that matched Petitioner (TT II at 122). In the face of such independent indicia of reliability, it was not an unreasonable application of the tenets of *Neil* or *Manson* for the Court of Appeals to conclude that Petitioner's counsel were not ineffective for failing to move to suppress Ms. Brown's identification testimony of Petitioner. *See Davis v. Thaut,* No. 99–35023, 1999 WL 731065, at *1 (9th Cir. Sept.19, 1999); *Latimer v. Maass,* No. 94–36001, 1995 WL 583483, at *1 (9th Cir. Oct.4, 1995).

The Court reaches this conclusion despite Petitioner's demonstration, in the course of this proceeding, that there were reasons to believe that Ms. Brown's identification of Petitioner was unreliable. Were this Court assessing the value of Ms. Brown's testimony on a blank slate, it might well agree with Petitioner that Ms. Brown's version of events is implausible. Ms. Brown's very precise and detailed identification of a woman unknown to her, as the driver of an automobile in the neighborhood of the site of the murder and arson at approximately 5:00 a.m. on October 11, 1991, was based on her observation of a vehicle which made a left turn in her path, nearly colliding with her truck. Ms. Brown made this observation in the pre-dawn hours, in what must have been a split-second incident. Nevertheless, she testified to the driver's hair color, her hair style, and even the darkened roots of her hair. It is fair to conclude that, without that testimony, Petitioner would not have been convicted.

This Court's function, however, is to decide whether the Court of Appeals applied federal law, as enunciated by the Supreme Court, unreasonably. For the reasons set forth above, this Court holds that the answer to that question is no; the Court of Appeals application of Supreme Court precedent was reasonable.

### ii. non–Mirandized statements to police

■ The rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is that a suspect subject to custodial interrogation must be informed before questioning of the right to: remain silent while in custody; be informed that anything the suspect asserts or says may be used in a later criminal proceeding; counsel; and, have counsel appointed if the suspect cannot afford to retain a lawyer. 27 James Wm. Moore et al., *Moore's Federal Practice* § 644.10[1]. Any fruits of a confession provided by a person under custodial interrogation who was not given *Miranda* warnings are, as a general rule, inadmissible.

Petitioner argues that trial counsel should have moved to suppress the statements Petitioner made during her many interviews with Sgt. Nowaczck because Sgt. Nowaczck had not read Petitioner the *Miranda* warnings. The Court of Appeals reasoned that "the record does not establish that the statements should have been suppressed." This Court holds that the Court of Appeals did not apply federal law unreasonably on this point.

■ The *Miranda* doctrine applies only where a suspect is in custody. The standard for determining whether a suspect is in custody is an objective one: a suspect is in custody when a reasonable person in that suspect's position would not feel free to leave. *Peerenboom v. Yukins,* 75 F.Supp.2d 691, 694 (E.D.Mich.1999) (Gadola, J.) (citing *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

Petitioner argues that she was in police custody during her interviews with Sgt. Nowaczck because: (1) Sgt. Nowaczck initiated the interviews; (2) Sgt. Nowaczck conducted some interviews in a room at the police station; (3) Sgt. Nowaczck basically accused Petitioner of committing the murder; (4) Sgt. Nowaczck conducted some interviews by showing up unannounced at Petitioner's place of employment; and (5) the interviews were intense. (Pet'r Br. I at 61–65.) Petitioner adduces no precedent, however, for the proposition that these factors would lead a reasonable person to feel unfree to leave, and has therefore put this Court in no position to hold that the Court of Appeals applied *Miranda* incorrectly when it held that trial counsel's failure to file a motion to suppress the non-*Mirandized* statements did not constitute ineffective assistance of counsel.

### iii. "failure to object when the prosecution brought out evidence that Ms. Hargrave–Thomas exercised her Fourth And Sixth Amendment rights"

 Petitioner maintains that trial counsel's "failure to object when the prosecution brought out evidence that Ms. Hargrave–Thomas exercised her Fourth And Sixth Amendment rights" warrants the conclusion that trial counsel were ineffective because, apparently, such evidence would have improperly prejudiced the trial court against her. As discussed above, Petitioner must show that counsel's performance was deficient in order to be entitled to relief under this theory. This she cannot do.

The problem with Petitioner's argument is that, had counsel objected to the introduction of evidence that Petitioner exercised her constitutional rights, she would have had to appraise Judge Baxter that she had, indeed, exercised her rights under the Fourth and Sixth Amendments. Considering that Judge Baxter would have been so appraised regardless of whether counsel objected to the prosecution's proffered evidence, a reasonable defense counsel would, as a tactical matter, probably have seen little gain in making such a fruitless objection in the course of a bench trial. *See United States v. Tyler,* 14 M.J. 811, 812 (A.C.M.R.1982); *cf. United States v. Hall,* No. 98–6421, 2000 WL 32010, at *2 (6th Cir. Jan.4, 2000) (reasoning that there was no prejudice resulting from counsel's failure to object to a violation of Federal Rule of Evidence 403 during a bench trial). The Court rejects this basis for Petitioner's argument that trial counsel were ineffective.

### C. Claim III: Insufficiency of the Evidence

 A habeas petitioner is entitled to relief on the ground of insufficient evidence only "if no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Welch,* 49 F.Supp.2d at 999 (quoting *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The Michigan Court of Appeals adjudicated Petitioner's claim thus:

We first consider defendant's argument that there was insufficient evidence to support her conviction of premeditated murder. We disagree.

We review a claim of insufficient evidence by looking at the evidence in the light most favorable to the prosecutor and determining whether a rational trier of fact could conclude that each element of the offense was proven beyond a reasonable doubt. *People v. Petrella,* 424 Mich. 221, 268–269, 380 N.W.2d 11 (1985). Although the case against defendant was largely circumstantial, when viewed in the light most favorable to the prosecutor we are satisfied that there was sufficient evidence to convict defen-

dant. Specifically, there was an established relationship between defendant and the victim, defendant was observed by a witness in the neighborhood during the relevant time period, and statements given by defendant to the police were inconsistent from that obtained from the witness. Additionally, it was reasonable for the trier of fact to conclude from the means of the killing and cover-up that this was a planned, premeditated killing.

Although the Court of Appeals did not refer directly to *Jackson*, it applied the correct "no rational trier of fact" standard. This Court must apply a deferential standard of review to state-court decisions on claims of insufficient evidence. *See Welch*, 49 F.Supp.2d at 1000 & n. 2 (discussing *Gomez v. Acevedo*, 106 F.3d 192, 193–94 (7th Cir.), *vacated on other grounds*, 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997)). In light of that deferential standard, and considering that the Court of Appeals accurately delineated the facts of this case and made a reasoned decision when applying the "no rational trier of fact" standard, this Court concludes that the decision of the Court of Appeals was neither contrary to, nor an unreasonable application of, federal law. Accordingly, this Court holds that Petitioner is not entitled to relief on the ground that her conviction for first degree murder was based upon insufficient evidence. *See generally id.*

### D. Claim IV: Prosecutorial Misconduct

■ Petitioner claims that "the prosecution denied Ms. Hargrave–Thomas the full and fair benefit of her constitutional right to a fair trial under the due process clauses of the Fifth and Fourteenth Amendments when it elicited prejudicial comments regarding Ms. Hargrave–Thomas' assertion of her constitutional rights and when it misstated the law, shifted the burden of proof, and diluted the burden of proof." (Pet'r Br. I at 81.)

The Court of Appeals reasoned thus:

Defendant next argues that the prosecution denied her a fair trial by deliberately eliciting evidence that defendant exercised her Fourth and Sixth Amendment rights, brought out both the request that defendant take a polygraph examination and an implied rejection of the request, and that the prosecutor shifted the burden of proof, diluted the burden of proof standard, and purposely misstated the law. We disagree. With respect to the claim that the prosecutor improperly elicited evidence that defendant had exercised her Fourth and Sixth Amendment rights, defendant failed to preserve this issue for appeal by raising the appropriate objection in the trial court. As for the testimony concerning a polygraph examination, not only was the answer by the witness stricken, it was done so at the request of the prosecutor. Furthermore, the trial court thereafter stated in ruling on a motion that it did not recall the testimony concerning a polygraph examination.

With respect to the claim that the prosecutor improperly diluted or shifted the burden of proof, misstating the law in the process, we are not convinced that the prosecutor did so when his comments are read in their entirety. In any event, this being a bench trial, the trial court certainly understood who possessed the burden of proof and there is no evidence from the record that the trial court misapplied the law or applied an incorrect burden of proof.

Assuming *arguendo* the truth of Petitioner's argument alleging prosecutorial misconduct, Petitioner has failed to show how this misconduct would have prejudiced Petitioner in a bench trial, where showing prejudice is more difficult. *See*

*Keyes Fibre Co. v. Packaging Corp. of Am.,* 763 F.Supp. 374, 376 (N.D.Ill.1991). As a trial judge presiding in a bench trial, Judge Baxter is presumed to know the law and apply it in making her decision. *People v. Sherman–Huffman,* 466 Mich. 39, 42, 642 N.W.2d 339 (2002). Even if the prosecution did commit the alleged violations, there is no indication that Judge Baxter was misled into an incorrect understanding of the law. Petitioner has not shown prejudice on the basis of prosecutorial misconduct. *See Macias v. Makowski,* 291 F.3d 447, 452–53 (6th Cir.2002). Accordingly, this Court holds that Petitioner is not entitled to relief on the ground of prejudicial prosecutorial misconduct.

## III CONCLUSION

This Court concludes that, because trial counsel were manifestly and flagrantly ineffective for failure to investigate or call witnesses or present evidence, and there was thus an obvious failure to effectively represent Petitioner at her trial for murder and arson, Petitioner is entitled to a new trial.

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Petitioner's motion for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **GRANTED.**

**IT IS FURTHER ORDERED** that Petitioner's conviction and sentence are **VACATED.**

**IT IS FURTHER ORDERED** that the State of Michigan shall either (1) set a new trial date that is within ninety days of entry of this order or (2) release Petitioner unconditionally.

**SO ORDERED.**